IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICKY LEE HOLLY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THOMAS CHRISTENSEN, et al., ) <br> ) <br> Defendants. ) <br> ) | **Case No. 07cv729 (RLJ)** |

### PLAINTIFF RICKY LEE HOLLY'S MOTION TO AMEND

Plaintiff Ricky Lee Holly ("Holly"), by and through counsel, moves to amend its complaint pursuant to Federal Rule of Civil Procedure 15(a). Fed.R.Civ.P. 15(a) ("A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served…."). None of these parties have filed a responsive pleading.[1] Pursuant to Local Rule 7(i), attached as exhibit A is the proposed amended pleading, which removes defendants THOMAS CHRISTENSEN and HARLEY LAPPIN as named parties.

Dated this 10th day of August, 2007

/s/ Paul E. Poirot
Paul E. Poirot (D.C. Bar No. 459844)
McDermott Will & Emery, LLP
600 13th Street, N.W.
Washington, D.C. 20005
Tel: (202) 756-8370
Fax: (202) 756-8087

Attorney for Plaintiff Ricky Lee Holly

---

[1] Pending before the Court as Docket No. 4 is Defendant Snyder's Motion to Dismiss or Transfer. Plaintiff has consented to transfer (but not dismissal) in its response. *See* Dkt. No. 7, Memorandum in Opposition to Motion to Dismiss or, Alternatively, To Transfer Venue.

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a copy to the following:

>Paul A. Kaplan (D.C. Bar No. 243394)
>Attorney for Defendant George Snyder
>Womble Carlyle Sandbridge & Rice, PLLC
>1401 Eye Street, N.W., Seventh Floor
>Washington, D.C. 20005
>Tel: (202) 467-6900


>KAREN L. MELNIK, D.C. BAR # 436452
>Assistant United States Attorney
>United States Attorney's Office
>Civil Division
>555 4th Street, N.W.
>Washington, D.C. 20530
>(202) 307-0338


>/s/ Paul E. Poirot
>Paul E. Poirot (D.C. Bar No. 459844)
>Attorney for Plaintiff Ricky Lee Holly

WDC99 1436208-1.009967.0484

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICKY LEE HOLLY                        )
8359 NORTHWEST HIGHWAY 225             )
OCALA, FL 34482,                       )
                                       )
            Plaintiff,                 )
                                       )   **Case No. 07cv729 (RLJ)**
       v.                              )
                                       )
WILLIE SCOTT, GEORGE SNYDER            )
RIVERS CORRECTIONAL                    )
INSTITUTION                            )
P.O. BOX 840                           )
WINTON, N.C. 27986                     )
                                       )
            Defendants.                )

**FIRST AMENDED COMPLAINT**

Plaintiff, Ricky Lee Holly, for his complaint against the Defendants alleges as follows:

**NATURE OF THE CASE**

1.     Mr. Holly filed a lawsuit in federal court in North Carolina for what he felt were constitutional violations of his right to be free from cruel and unusual punishment. Even though the lawsuit was ultimately unsuccessful, the Defendants in this case retaliated against Mr. Holly by placing him in solitary confinement, revoking his earned good time, and denying him typical time in a halfway house at the end of his sentence. The only reason that Mr. Holly was punished in that manner was because he had tried to bring his complaints about his medical treatment to light before the federal courts.

2.     This is an action for money damages for the constitutional deprivations that Mr. Holly suffered at the hands of the Defendants. Specifically, the Defendants

denied Mr. Holly his right of meaningful access to the courts pursuant to the First Amendment, right to due process of law pursuant to the Fifth Amendment, and right to be free from cruel and unusual punishment pursuant to the Eighth Amendment. Mr. Holly petitions the government for redress of grievances, as guaranteed by the United States Constitution pursuant to the cause of action established in *Bivens v. Six Unknown Federal Agents, 403 U.S. 388 (1971)*.

## THE PARTIES

3. The plaintiff, Ricky Lee Holly, was at all relevant times, a resident of the District of Columbia, and was at all times relevant to this action incarcerated in Rivers Correctional Institution ("Rivers"), a privately run prison located in North Carolina and operated by GEO Group, Inc ("GEO") pursuant to a written contract with the Federal Bureau of Prisons ("BOP"). Moreover, at all times relevant to this action, Mr. Holly was under the care and custody of the BOP, its employees, and the employees of Rivers.

4. DEFENDANT WILLIE SCOTT was employed at Rivers during the first part of Mr. Holly's incarceration as the warden of Rivers and was charged with overseeing the custody and care of Mr. Holly. GEORGE SNYDER was employed at Rivers during the latter portion of Mr. Holly's incarceration as the warden of Rivers and was charged with overseeing the custody and care of Mr. Holly. The above named Defendants are each sued in his capacity as an individual. At all times relevant to this action, DEFENDANTS SCOTT and SNYDER were acting under the color of law.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution of the United States.

6.     This court has personal jurisdiction over all the Defendants.

7.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 1391(e)(1), and 28 U.S.C. § 1391(e)(2).

## STATEMENT OF FACTS

### A.     D.C. Code Offenders Are in the Custody of the BOP

8.     In 1997, the United States Congress passed the National Capital Revitalization and Self-Government Improvement Act of 1997, Title XI of PL 105-33, 111 Stat. 712 ("Revitalization Act").

9.     Now codified in part in D.C. Code 24-101, the Revitalization Act requires that any person who is sentenced to incarceration pursuant to D.C. law be committed to the custody of the BOP and housed in BOP institutions.

10.    Pursuant to federal law, the BOP has the authority to designate the location of each prisoner's incarceration.

11.    The Revitalization Act requires that the BOP house at least 50% of the felony offenders sentenced in D.C. in private for-profit contract facilities.

### B.     GEO's Rivers Correctional Institution

12.    Rivers is a private for-profit facility and is owned and operated by GEO.

13.    Rivers is located at 145 Parker's Fishery Rd., Winton, NC 27986.

14.    GEO is a publicly held corporation, headquartered in Boca Raton, Florida. Its stock is traded on the New York Stock Exchange under ticker symbol GEO.

15. GEO was originally founded as a subdivision of Wackenhut Corporation under the name Wackenhut Corrections Corporation. Through mense transactions, Wackenhut Corrections Corporation became an independent corporate entity and changed its name to GEO Group Inc.

16. GEO was awarded a federal contract to house low security male D.C. prisoners in 2000 for a duration of three years with seven one-year options. GEO houses most of the prisoners sentenced in D.C.

17. Rivers now houses approximately 1,300 federal inmates, approximately 1,100 of whom are D.C. Code offenders.

      C.     **Mr. Holly Filed His Original Federal Lawsuit**

18. In or about November 2001, Mr. Holly was arrested in the District of Columbia on charges of Assault with a Dangerous Weapon.

19. On July 7, 2002, pursuant to his conviction for violations of portions of the D.C. Code, Mr. Holly was sentenced to four years imprisonment and three years supervised release.

20. Pursuant to the contract between the BOP and GEO, as a D.C. resident, Mr. Holly was placed in Rivers on August 29, 2002.

21. At all times relevant to this lawsuit, Mr. Holly was serving a sentence under the D.C. Code.

22. At the time of his initial intake medical examination at Rivers, Mr. Holly informed the staff that he was a diabetic.

23. Diabetes is a serious, chronic medical condition that requires medical intervention, treatment, and daily monitoring and can have grave consequences if the proper treatment regimen is not followed.

24. Mr. Holly had previously suffered from various medical problems as a result of his diabetes, including having experienced hypoglycemic episodes of blacking out. Mr. Holly explicitly informed the Rivers staff of these problems during his intake examination.

25. Despite their knowledge of his condition, the Rivers staff, specifically Dr. Gaddy Lassiter, the doctor at Rivers, and DEFENDANT SCOTT, failed and refused to take the necessary steps to treat Mr. Holly's diabetes by not properly administering the right kinds or amounts of insulin, not properly monitoring his blood sugar levels, and not providing a proper diabetic diet.

26. On August 25, 2003, Mr. Holly filed a *pro se* complaint in the United States District Court for the Eastern District of North Carolina (Western Division), Case number 5:03-ct-00640-FL, alleging deficiencies in the medical care he received at Rivers for his diabetes ("NC Litigation").

27. DEFENDANT SCOTT and Dr. Lassiter were named as defendants in the NC Litigation.

28. DEFENDANT SCOTT and Dr. Lassiter were personally served with process in the NC Litigation on October 17, 2003.

**29.** Eventually, in *Holly v. Scott*, 434 F.3d 287 (4th Cir. 2006), the Fourth Circuit dismissed Mr. Holly's case, holding that individuals employed by GEO, a private

company, although acting under color of state law, were immune from suit for depriving Mr. Holly of his constitutional rights.

### D. Mr. Holly Is Retaliated Against for Exercising His First Amendment Rights

30. After the Defendants were served with copies of the complaint in the NC Litigation, Mr. Holly began to experience a pattern of severe treatment and deprivation of the few liberties he enjoyed as a prisoner, despite no changes in his own behavior.

31. On October 21, 2003, four days after the Defendants were served with the complaint in the NC Litigation, the Rivers staff handcuffed Mr. Holly with such force and in such a manner that he suffered cuts on his wrists and his skin was rubbed raw.

32. Two days later, on October 23, 2003, the Rivers staff placed Mr. Holly in solitary confinement for "protective custody," based on a specious claim that a serious threat existed to his safety. Defendants have never disclosed the nature or source of this purported "threat."

33. One week later, on October 30, 2003, while still in solitary confinement, as a result of Defendants' failure to treat Mr. Holly's chronic diabetes, Mr. Holly blacked out and was rendered unconscious. While he was unconscious, Mr. Holly was not provided with medical treatment; the Rivers staff, however, did place Mr. Holly in handcuffs with such force as to cause him injury.

34. After regaining consciousness, Mr. Holly found he remained in solitary confinement. Again, he inquired as to the reason he was being placed into solitary confinement, and this time the Rivers staff informed Mr. Holly that the placement was ordered by Nurse Keel, the head healthcare administrator at Rivers.

35. Subsequently, several members of the non-medical correctional staff at Rivers informed Mr. Holly that Nurse Keel had ordered the placement of Mr. Holly in solitary confinement because he had filed a lawsuit against members of the River staff.

36. Nurse Keel was at all relevant times under the control and supervision of DEFENDANT SCOTT.

37. On information and belief, DEFENDANT SCOTT was personally aware of Nurse Keel's and the rest of the Rivers staff's retaliatory actions against Mr. Holly and failed to reprimand them or stop their actions.

### E. Mr. Holly Challenges the Deprivation of His Rights

38. After being informed that he was being placed in solitary confinement in retaliation for filing the NC Litigation, Mr. Holly followed the proper procedure at Rivers to challenge this unlawful retaliation and punishment.

39. Mr. Holly first made an official inquiry to determine the reason for his placement in solitary confinement.

40. In response, on November 5, 2003, Lt. Stevenson, a staff member at Rivers under the control and supervision of DEFENDANT SCOTT, answered that the Rivers staff had placed Mr. Holly in solitary confinement, not for protective custody, but because of Mr. Holly's diabetes.

41. On information and belief, DEFENDANT SCOTT was aware that Mr. Holly had been placed in solitary confinement.

42. This statement was purely pretext. Standard corrections practice is not to use solitary confinement as a medical treatment procedure. Standard corrections practice requires a separate medical unit for treatment of ill inmates. On information and belief,

these standards are reflected in BOP policies and in the contract between the BOP and GEO.  Additionally, on information and belief, such a medical unit was available at Rivers at the time of Mr. Holly's confinement in solitary.

43.   Shortly after informing Mr. Holly that his diabetes "required" that the Rivers staff place him in solitary confinement, the Rivers staff transferred Mr. Holly from the solitary confinement area to the Rivers medical unit.  Shortly after this transfer, inexplicably, the Rivers staff transferred Mr. Holly back to solitary confinement.

44.   After being transferred back to solitary confinement for the second time, Mr. Holly again made an official inquiry as to why the Rivers staff believed that they were required to place him in solitary confinement due to his diabetes.

45.   On November 11, 2003, Lt. Stevenson, a correctional officer at Rivers, again informed Mr. Holly that he had been placed in solitary confinement purely for medical reasons.

46.   On information and belief, DEFENDANT SCOTT was aware that Mr. Holly had been placed back in solitary confinement.

47.   On November 13, 2003, Lt. Chance, the Special Housing Officer at Rivers, reviewed Mr. Holly's placement in solitary confinement.  In approving Mr. Holly's continued placement in solitary confinement, Lt. Chance did not identify a specific reason that Mr. Holly's "continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or to the security or orderly running of the institution."  Rather, he stated that this decision was based on "observation" without providing any details.

48. On November 24, 2003, Lt. Stevenson informed Mr. Holly that only the chief of security or the medical unit staff could explain why he was in solitary confinement.

49. Despite being told that his diabetes required placement in solitary confinement, on November 25, 2003, the very next day, after thirty-three days of solitary confinement, and with no change in his medical condition or behavior, Dr. Lassiter signed a form that stated Mr. Holly could be released from solitary confinement.

50. In January of 2004, Mr. Holly again filed a request for an explanation of why he had been placed in solitary confinement.

51. In response, the Rivers staff, who received their instructions from DEFENDANTS SCOTT or SNYDER, again informed Mr. Holly that he had been placed in solitary confinement for his medical issues.

52. In late March, 2004, for no legitimate or discernable rational reason, and with no explanation to Mr. Holly, Nurse Keel interfered with Mr. Holly's food service and attempted to stop him from getting the medically-ordered evening snack bag he needed as part of his diabetes management regimen.

53. In April, 2004, again for no legitimate or discernable rational reason, Mr. Holly's ability to keep non-narcotic medication (such as aspirin) on his person was revoked. Instead, he was required to wait in a "pill line" for each dose of medication he needed. The pill line at Rivers is conducted at the same time meals are served. The result of waiting up to forty-five minutes, three times per day, and having to choose between medicine and meals, was that Mr. Holly was unable to manage his diabetes and prevent blackouts, causing further damage to his condition. His official written complaints about

this matter were never substantively responded to by either DEFENDANT SCOTT OR SNYDER.

      **F.**  **Defendants Must Follow Proper Procedure When Revoking Earned Good Time From Prisoners**

  54.  Mr. Holly was eligible to earn up to fifty-four days of "good time," *i.e.,* a reduction in total time served based on good behavior, for each year served.

  55.  The BOP policy is to have a Discipline Hearing Officer ("DHO") at each institution, including for-profit contract facilities such as Rivers.

  56.  At the relevant time, the DHO at Rivers was Mr. K. DuBose.

  57.  On information and belief, a decision of the DHO to revoke earned good time from a person is subject to a procedural review by the warden of the institution, in this case, DEFENDANTS SCOTT and SNYDER.

  58.  In determining the amount of earned good time to take away from an inmate for an infraction, the DHO is required to assess the seriousness of the prohibited act.

  59.  An inmate may appeal the loss of earned good time through the BOP's administrative remedy procedure as outlined in BOP Policy Statement 1330.13.

  60.  As part of the administration of an inmate's sentence and the calculation of the duration of imprisonment, the BOP and its employees are ultimately responsible for the lawful administration of all earned good time credits.

      **G.**  **Defendants Improperly Revoked Mr. Holly's Earned Good Time Credits and Imposed More Time in Solitary Confinement**

  61.  Before he filed the NC Litigation, Mr. Holly had never had any good time credits revoked at any institution in which he was housed while serving his sentence.

62. On July 1, 2004, Mr. Holly suffered an adverse physical reaction to the insulin he was given by the Defendants to treat his diabetes. This reaction caused him to lose partial consciousness and to react violently to those around him.

63. As a result, several officers were called to his cell to restrain him to control his reaction.

64. During the altercation, Mr. Holly reacted violently. Violent action is well known in the medical community as a side effect of low blood sugar.

65. The staff at Rivers was aware of this effect, as evidenced by the fact that immediately following this incident, Mr. Holly was taken to the infirmary for treatment of low blood sugar. This treatment stopped the physical symptoms being experienced by Mr. Holly.

66. Even while having actual knowledge of Mr. Holly's chronic diabetes and that proper treatment of his condition would have stopped the adverse reaction that Mr. Holly experienced, Defendants initiated proceedings to discipline Mr. Holly based on this medical emergency.

67. Based on information and belief, this punitive reaction to Mr. Holly's medical emergency was motivated by animus toward him for filing the NC Litigation.

68. In reviewing this incident, the DHO acknowledged that there was a medical reason for Mr. Holly's actions during the incident. Despite this acknowledgement, the DHO sentenced Mr. Holly to thirty days in solitary confinement (in addition to the twenty days he had spent there awaiting the hearing) and revoked twenty-seven days of earned good time credits.

69. On December 17, 2004, Mr. Holly, who was, at the time, confined in the medical isolation unit, was observed to be wiping the viewing camera with some sort of substance. When confronted by the Rivers staff, Mr. Holly began using profanity and throwing objects against the closed door of his cell. The violent nature of his reaction demonstrably resulted from complications of his diabetes.

70. As a result of this incident, the DHO revoked an additional fourteen days of earned good time credits and sentenced Mr. Holly to a total of thirty additional days in solitary confinement.

71. On information and belief, if Mr. Holly had not filed the NC Litigation, he would not have been punished for suffering medical complications of diabetes; indeed, he would instead have been offered medical treatment.

72. On information and belief, DEFENDANT SCOTT was aware that Mr. Holly was being deprived of good time credits in retaliation for filing his lawsuit.

73. As "punishment" for filing the NC Litigation, Mr. Holly had a total of at least forty days of earned good time credits revoked from him.

      **H.**    **Defendants Retaliated by Taking Away Mr. Holly's Halfway House Time**

74. At the end of his sentence, based on standard BOP policy, Mr. Holly would have been confined for a time in a BOP halfway house, otherwise known as a "Community Corrections Center" ("CCC"). Prisoners, barring unusual circumstances, usually spend the last few months of their sentence at a CCC.

75. Placing inmates in CCCs increases public safety by aiding the transition of the offender into the community.

76. The prisoner's unit team makes referrals to CCCs and the final decision making authority is vested in the warden of the institution, in this case DEFENDANT SNYDER, who was the warden of Rivers at the time that Mr. Holly should have been placed in the CCC.

77. Mr. Holly received notice in early 2005 that his CCC time was being denied, due to the retaliatory discipline record he received, *i.e.*, being wrongly disciplined under the pretext that his known medical condition was, instead, bad behavior.

78. On information and belief, Mr. Holly was denied CCC time in retaliation for having filed the NC Litigation.

79. On information and belief, DEFENDANT SNYDER was aware or should have been aware that Mr. Holly was denied CCC time in retaliation for having filed the NC Litigation.

80. Mr. Holly was finally released from Rivers on August 9, 2005, having not been allowed to serve any of his sentence at a CCC.

### FIRST CLAIM FOR RELIEF

### Violation of Mr. Holly's First Amendment Rights

81. Mr. Holly incorporates by reference paragraphs 1 through 84, above.

82. Mr. Holly has a clearly established right protected by the First Amendment to the United States Constitution to adequate, effective, and meaningful access to the courts. Moreover, Mr. Holly has a clearly established constitutional right to be free from retaliation for exercising this constitutional right.

83. Mr. Holly engaged in constitutionally protected conduct by filing the NC Litigation.

84. Defendants' actions in retaliation against Mr. Holly for filing the NC Litigation would deter a person of ordinary fitness from asserting his constitutional rights in the future.

85. As a result of Defendants' actions, Mr. Holly suffered the deprivations attendant in being placed in administrative segregation, the loss of earned good time credits and the loss of time in a halfway house.

## SECOND CLAIM FOR RELIEF

### Violation of Fifth Amendment Right To Due Process

86. Mr. Holly incorporates by reference paragraphs 1 through 89, above.

87. Mr. Holly has a clearly established right under the Fifth Amendment to the United States Constitution to receive due process of the law before being deprived of good time credits.

88. Although he was deprived of good time credits, Mr. Holly did not receive the process required by law.

89. Mr. Holly has been damaged by Defendants' unconstitutional actions and is entitled to monetary relief for Defendants' violation of Mr. Holly's clearly established constitutional rights.

## THIRD CLAIM FOR RELIEF

### Violation of Eighth Amendment

90. Mr. Holly incorporates by reference paragraphs 1 through 93, above.

91. Mr. Holly has a clearly established right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment.

92. In response to Mr. Holly asserting his right of access to the courts, the Defendants placed Mr. Holly in administrative segregation – solitary confinement – for over fifty-three days.

93. This unjustified punishment in retaliation for Mr. Holly's constitutionally protected conduct in filing the NC Litigation violated his Eighth Amendment rights

94. Mr. Holly has been damaged by Defendants' unconstitutional actions and is entitled to monetary relief for Defendants' violation of Mr. Holly's clearly established constitutional rights.

## JURY DEMAND

95. Mr. Holly hereby demands trial by jury.

/     /     /

**RELIEF**

**WHEREFORE**, Mr. Holly requests that this Court grant the following relief:

1. Award Plaintiff compensatory damages in an amount to be determined at trial;

2. Award Plaintiff punitive damages in an amount to be determined at trial;

3. Award plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988 in connection with this action; and

4. Grant such other relief as this Court deems just and proper.

        Respectfully Submitted,

        /s/Paul E. Poirot
        Paul E. Poirot
        D.C. Bar # 459844
        McDermott Will & Emery LLP
        600 Thirteenth Street, N.W.
        Washington, DC 20005-3096
        Telephone: 202.756.8370

        Deborah M. Golden
        D.C. Bar # 470578
        D.C. Prisoners' Project
        Washington Lawyers' Committee for Civil Rights and Urban Affairs
        11 Dupont Circle, Suite 400
        Washington, DC 20036
        Telephone: 202.319.1000

        *Attorneys for Plaintiff*
        *Ricky Lee Holly*

Dated: August 10, 2007